IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| KING CHARLES PARAMORE, JR. | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TEMPLE UNIVERSITY, et al.[1] | : | NO.  23-3359 |

## <u>MEMORANDUM AND ORDER</u>

CAROLINE GOLDNER CINQUANTO, U.S.M.J.                    January  20, 2026

      Defendants, Temple University, Edward Woltemate ("Captain Woltemate"), and

Charles James ("Lieutenant James") (collectively, "Defendants"), seek summary

judgment in this employment discrimination and retaliation case brought by King Charles

Paramore, Jr. ("Plaintiff"), a former detective sergeant employed by Temple University in

its Bureau of Campus Safety/Campus Safety Services ("Temple Police").  Because I find

that there are no issues of material fact and Defendants are entitled to judgment as a

matter of law, I will grant Defendants' motion.

---

[1]Temple University's proper corporate name is Temple University-Of The Commonwealth System of Higher Education.  Doc. 49 at 4.  Throughout this Memorandum, I will refer to the University as Temple University or Temple.

      Defendants provided a Statement of Undisputed Material Facts (Doc. 50), which I will refer to as "SUF."  Plaintiff provided a Counterstatement of Facts (Doc. 51 at 14-17), which I will refer to as "CoF."  Additionally, counsel provided a Joint Appendix, including deposition transcripts, the EEOC charge, and other documents, which I will identify by document and the Joint Appendix ("JA") page number.  Plaintiff also has a pending Workers' Compensation claim and some of the depositions were taken in that context.  Pinpoint page citations to other documents filed with the court will be to the court's ECF pagination.

## I.    FACTUAL AND PROCEDURAL BACKGROUND

Temple University hired Plaintiff, who is African American, as a Police Officer in January 1993.  SUF ¶ 17.  In August 2000, Plaintiff became a Detective.  Id. ¶ 23.[2]  On April 15, 2017, Temple promoted Plaintiff to the position of Sergeant.  Id. ¶ 40.

Temple hired Captain Woltemate, a Caucasian male and 23-year veteran of the Philadelphia Police Department, as a lieutenant in 2008.  Captain Woltemate's duties included supervising investigations in the Temple University Police Department.  SUF ¶¶ 28-31.  According to the Amended Complaint, Captain Woltemate, "who was in overall charge and control of the day to day operations of the Temple Police[,] tolerated and encouraged an atmosphere of racial bias and race-based animus in assignments."  Doc. 29 ¶ 8.  Plaintiff maintains that Captain Woltemate "tolerated and chose not to discipline subordinate officers like [Lieutenant] James who engaged in remarks such as not permitting African American police officers to use certain equipment or on certain shifts because he thought they were 'lazy.'"  Id.

Lieutenant James, a Caucasian male, worked in Temple University's Police Department Patrol unit for over 30 years.  SUF ¶ 83.  On July 22, 2022, Lieutenant James was the first officer on the scene of a shooting in the area of Broad and Cecil B. Moore Streets.  Id. ¶¶ 83, 90.  "At some point after interviewing witnesses, Lieutenant James called on the radio and asked for 'DAN-17,' which was the call sign for Detective Ryan Aitken."  Id. ¶ 92.  Plaintiff maintains that Lieutenant James requested Detective Aitken

---

[2]Plaintiff disputes that he was "promoted" to the position, but does not deny that he was a detective.  Doc. 51 ¶ 23.

because Aitken was Caucasian.  Doc. 51 ¶ 93.  Specifically, Plaintiff alleges that, in response to the shooting incident, Lieutenant James requested the assistance of a detective "who was much farther away from the scene[,] but who was among the group of people preferred by [Lieutenant] James."  Doc. 29 ¶¶ 11-14.  In response to the request, Plaintiff sent Detective Agoey Ombina to the scene.  Id. ¶ 102 (quoting Paramore Dep. at 29-30 (JA 185:19-JA286:15)), Doc. 51 at 102; see also James Dep. at 51-52, 57 (JA836-37, 842) (Detective Ombima arrived at the scene after Lieutenant James requested a detective).  At the scene, Lieutenant James told another Temple officer that "he wanted to punch Paramore 'in the dick.'"  Doc. 51, Counterstatement of Facts ("CoF") ¶ 1; see also James Dep. at 59-60 (JA844-45).  At the scene, Lieutenant James also said that "he needed to go," referring to Plaintiff.  James Dep. at 60 (JA845).

When Lieutenant James returned to the Patrol Supervisor's Office to prepare the Incident Report, Sergeant Gonzalez was in that office.  James Dep. at 74-75 (JA859-60).  Both Plaintiff and Lieutenant James agree that shortly after Lieutenant James entered the office, Plaintiff knocked on the door and calmly asked Sergeant Gonzalez to leave so he could speak with Lieutenant James.   Id. at 78 (JA863); Paramore Dep. at 31-32 (JA287-88).  Accounts of the conversation that followed vary greatly.  Compare James Dep. at 79 ("Paramore . . .  began yelling, screaming, cursing fuck you and pointing his right index finger towards me in an aggressive manner"), with Paramore Dep. at 33-34 (Plaintiff

addressed inappropriate racial comments made by Lieutenant James, who responded by "challenging" him by fabricating that Plaintiff was the aggressor).[3]

    After the confrontation, Lieutenant James, followed by Plaintiff, left the Patrol Supervisor's office and went to Captain Enock McCoy's office.  SUF ¶ 113.  Captain McCoy, an African American male, described the ongoing discussion between the two as "a verbal altercation."  McCoy Dep. at 19 (JA615).  Captain Mcoy also alleged that when Plaintiff "was right in [Lieutenant James'] face, Lieutenant James pushed him back away from him and then retreated behind [McCoy's] desk."  Id. at 20 (JA616).  Captain McCoy described a light push.  See McCoy Dep. at 57 (JA533) ("[I]t might have been a step backwards, maybe a step or two backwards, but it wasn't anything, he didn't push him – there wasn't enough force from the way that Lieutenant James pushed Sargeant Paramore to back him up or to push him back or to forcefully move him back anymore than maybe a step or two.").  Lieutenant James is 5' 8" tall and weighs 185 pounds.  SUF ¶ 120; Doc.

---

[3]Plaintiff testified that Lieutenant James yelled "Back up," when Paramore was just leaning forward in his chair.  Paramore Dep. at 35 (JA291).

> "Fuck that, Chuck, and that fucking body camera on your chest.  Ain't nobody coming at you in your space.  What are you talking about?"  At that point I realized that I believed it was consistent with what other people told me he's done on the street, challenging people.  When he did it to me, it was unbelievable.  I worked with this man for 30 years, and that he would do that with me, because I'm trying to figure out what comes next because what has been said is, you know, it's a resisting arrest situation.  It's the -- so what are we going to have here?  That's why I was like, "You got a body camera on.  What are you talking about?  Nobody's doing anything to you."

Id.

51 ¶ 120.  Plaintiff is 6' tall and weighs 250 pounds.  Paramore Dep. at 148 (JA165).

Neither Plaintiff nor Lieutenant James was disciplined regarding this incident.  SUF

¶ 124-25; Doc. 51 ¶ 124-25.[4]  And although Plaintiff now claims he was injured in the

incident, he did not seek medical attention.  Paramore Dep. at 112-13 (JA444-45).

Plaintiff finished his shift on July 22, 2022.  Paramore Dep. at 40. 44 (JA296,

300).  Plaintiff took sick leave the following week beginning on July 25, 2022, and

contacted Temple on July 29, 2022, requesting Family and Medical Leave Act ("FMLA")

paperwork "for anticipated submittal to my medical/care provider," JA1651; see also

Paramore Dep. at 44 (JA302).  The FMLA paperwork was sent to Plaintiff on August 1,

2022.  JA1658.

According to Plaintiff, "having endured years of racial harassment prior to this

point, [he] immediately sought mental health treatment[, and] workers['] compensation

benefits."  Doc. 29 ¶ 19.  On August 12, 2022, Armina Domingue, LMSW, Plaintiff's

treating psychotherapist, completed the FMLA paperwork indicating that Plaintiff would

be incapacitated for 90 days as a result of post-traumatic stress disorder ("PTSD"),

anxiety, and depression.  JA 1681-82.  On August 22, 2022, Thomas F. Johnston,

Director of Temple's Workers' Compensation & Absence Management, notified Plaintiff

---

[4]According to Plaintiff's Amended Complaint, when he objected to Lieutenant
James' actions, a verbal confrontation occurred and "[t]hough it did not occur,
[Lieutenant] James accused Plaintiff of physical assault, which [Captain] Woltemate
ratified and imposed discipline in the form of a suspension on Plaintiff."  Id. ¶¶ 16-17.
There is no evidence to support the allegation that either officer was disciplined.  SUF
¶ 124; Doc. 51 ¶ 124.

that Temple was "exercising [its] right under the Family and Medical Leave Act to have [him] undergo a second opinion."  JA1685.  Robert DeSilverio, M.D., completed his assessment of Plaintiff on October 1, 2022, finding Plaintiff "to manifest delusional thinking, as in Delusional Disorder, Persecutory Type" and recommended "a second opinion with a psychiatrist specializing in psychotic conditions."  JA1726.  Based on his examination, Dr. DeSilverio noted that "[p]aranoid conditions, as long as active, would be considered disqualifying for law enforcement positions," and found Plaintiff "currently disabled from law enforcement positions," but "would defer to a second opinion in regard to permanency."  JA1726.  Plaintiff alleges that Temple "stripped [him] of his badge and gun and forbade him from being a police officer" as a result of Dr. DiSilverio's opinion.  Id. ¶ 23.  Plaintiff received FMLA leave, during which he received his salary.  SUF ¶ 129.

In response to Dr. DiSilverio's opinion, Plaintiff exercised his right to a third opinion.  JA1757.  Numerous emails and letters were exchanged regarding the selection of a doctor to present a third opinion.  See JA1759-1891 ( Oct. 11, 2022 - Dec. 22, 2022).  On December 22, 2022, Temple confirmed an appointment for the third opinion with David Springer, M.D., for January 13, 2023.  JA1894.  Plaintiff did not appear for the examination.  JA1924. On January 30, 2023, Plaintiff contacted Mr. Johnston stating that he did "not understand fully how after so much time has passed how this third evaluation will impact my status moving forward."  JA1937.

On January 31, 2023, Mr. Johnston notified Plaintiff that he should apply for Long Term Disability ("LTD") through Prudential, JA1940, which Plaintiff did.  See JA1941.

On May 13, 2023, Prudential notified Temple that it had disallowed Plaintiff's claim for LTD. JA1947. On July 21, 2023, Mr. Johnston notified Plaintiff that his "employment relationship with Temple University is terminated, as of . . . 7/21/23," when he had been on a leave of absence for one year without being approved for LTD. JA2035. Mr. Johnston also indicated that if an appeal of Prudential's decision were successful, his employment status would change to "in-active on leave," and his benefits would be reinstated retroactively. JA2035.

On November 15, 2023, Prudential notified Temple that they had reconsidered the decision and approved Plaintiff's claim for LTD. JA1973. On November 28, 2023, Mr. Johnston notified Plaintiff that, upon notification of Prudenitial's reconsideration decision, his employment status was changed to "Inactive/LTD," and Temple had reactivated his Temple-provided benefits. JA1974. On November 13, 2024, Mr. Johnston contacted Plaintiff because Prudential had terminated his LTD effective September 30, 2024, resulting in the termination of Plaintiff's employment with Temple. JA2137. The letter also informed Plaintiff that if he successfully appealed Prudential's decision, any COBRA payments for benefits would be returned to him and if his physician released him to return to work, he could apply for available positions with Temple. JA2137.

On August 28, 2023, Plaintiff commenced this action pro se alleging race discrimination and retaliation. Doc. 2. After entering his appearance, Plaintiff's counsel filed an Amended Complaint. Docs. 21, 27, 29. Although not a model of clarity, the Amended Complaint alleges race discrimination and retaliation, focusing on Captain

7

Woltemate's tolerance of "an atmosphere of racial bias and race-based animus in assignments," and failure "to discipline subordinate officers like [Lieutenant] James who engaged in remarks such as not permitting African American police officers to use certain equipment or on certain shifts because he thought that they were 'lazy,'" Doc. 29 ¶ 8. The Amended Complaint also alleges that Dr. DeSilverio's opinion "was infused with and clouded by racial prejudice. Id. ¶ 22.

In the Motion for Summary Judgment, Defendants argue that both Temple University and Lieutenant James are inappropriate defendants. Temple University because it is a state actor and Lieutenant James because he was not Plaintiff's supervisor. Doc. 49 at 25-28. Additionally, Defendants argue that Plaintiff has no retaliation claim and that the discrimination claim fails because Plaintiff was not subject to an adverse employment action. Id. at 28-36. Finally, Defendants argue that the evidence does not support an award of punitive damages. Id. at 36. Plaintiff disputes each of these contentions and argues that genuine issues of material fact exist, barring summary judgment. Doc. 51 at 27-33.

## II.    LEGAL STANDARD

A moving party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. Anderson v. Liberty

Lobby, Inc., 477 U.S. 242, 248 (1986).[5]  A factual dispute is "material" if it might affect the outcome of the case under governing law.  Id.

"A party asserting that a fact cannot be or is genuinely disputed must support the assertion by . . . citing to particular parts of materials in the record . . .  or showing that the materials cited do not establish the absence or presence of a genuine dispute . . . ." Fed. R. Civ. P. 56(c)(1)(A), (B).  "Speculation, conclusory allegations, and mere denials are insufficient to raise genuine issues of material fact."  Boykins v. Lucent Techs., Inc., 78 F. Supp.2d 402, 408 (E.D. Pa. 2000).

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. Cnty. of Allegheny Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Del. Co., 998 F.2d 1224, 1240 (3d Cir. 1993)).  Rather, the court must consider the evidence and all reasonable inferences which may be drawn from it, "in the light most favorable to the non-moving party."  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 487 (1986) (quoting United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)).  If a conflict arises between the evidence presented by the parties, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in [his] favor."  Anderson, 477 U.S. at 255. "[W]hen evidentiary facts are in dispute, when the credibility of witnesses may be in

---

[5]Anderson predated the 2010 Amendment to Rule 56.  However, the change in wording and location within the rule for the summary judgment standard did not alter the standard or caselaw interpretation of the standard.  Fed. R. Civ. P. 56 advisory committee's note to 2010 Amendment.

issue, or when conflicting evidence must be weighed, a full trial is usually necessary."

Burke v. TransAm Trucking, Inc., 605 F. Supp.2d 647, 651 (M.D. Pa. 2009).

## III.    DISCUSSION

### A.    Temple University – Monell Liability

The parties agree that Temple University is a state actor.  Doc. 49 at 25; Doc. 51 at

28.  Therefore, Temple can only be found liable under sections 1981 and 1983 if the

violation of Plaintiff' rights "was caused by a custom or policy within the meaning of

Monell [v. Department of Social Services of City of New York, 436 U.S. 658, 690

(1978)] and subsequent cases."  Jett v. Dallas Ind. Sch. Dist., 491 U.S. 701, 735-36

(1989).  "A 'policy is made when a decisionmaker possess[ing] final authority to

establish municipal policy with respect to the action issues an official proclamation,

policy or edict.'"  Kirby v. Visionquest Nat'l., Ltd., Civ. No. 15-6208, 2016 WL

1623439, at *3 (E.D. Pa. Apr. 25, 2016) (quoting Cummings v. City of Chester, Arthur

Grenier, Civ. No. 15-4504, 2016 WL 304790, at *3 (E.D. Pa. Jan. 26, 2016) (citing

Mulholland v. Cnty. of Berks, 706 F.3d 227, 237 (3d Cir. 2013)).  "[A] custom 'lacks the

formal approval of a municipal policy,' but consists of 'such practices of state officials . .

. [as are] so permanent and well settled as to constitute a 'custom or usage' with the

force of law.'"  Id. (citing Glass v. City of Phila., 455 F. Supp.2d 302, 341 (E.D. Pa.

2006) (citing Monell, 436 U.S. at 691)).  "[G]enerally[,] a custom must be shown to be a

pattern; more than a 'single incident will be necessary to establish a causal connection

between the incident and some municipal policy.'"  O'Hara v. Cnty. of Allegheny, Civ.

No. 12-818, 2013 WL 501374, at *4 (W.D. Pa. Feb. 8, 2013) (quoting Schmidt v.

Freeland, 2012 WL 911840, at *2 (M.D. Pa. Mar. 16, 2012) (quoting Brown v. City of

Pittsburgh, 586 F.3d 263, 293 (3d Cir. 2009)).  Thus, to state a 1983 claim against a state

actor, "a plaintiff must establish that (1) a constitutionally protected right has been

violated by a state actor, and (2) the alleged violation resulted from a municipal policy,

custom, or deliberate indifference to a violation of a constitutional right."  Mulholland v.

Phila. Sch. Dist., Civ. No. 25-2171, 2025 WL 2414164, at *8 (E.D. Pa. Aug. 20, 2025)

(citing Monell, 436 U.S. at 694-95).

    Here, Defendants maintain that Plaintiff has failed to meet his "burden to show a

discriminatory policy or custom that caused Plaintiff's harm."  Doc. 49 at 26.  Plaintiff

argues that "Temple University created a custom of open racial hostility amongst its

TUPD officers" and "employed a custom and/or a practice of utilizing and relying on pre-

ordained opinions such as those expressed by Dr. DeSilverio, that rely on and employ

flawed, unreliable, and racially motivated diagnoses to reach pre-ordained conclusions."

Doc. 51 at 28.  I will address each, in turn.

       1.     Temple University created a custom of open racial hostility amongst
                    its TUPD officers

    Plaintiff asserts that "[Captain] Woltemate -who was in overall charge and control

of the day to day operation of the Temple Police – tolerated and encouraged an

atmosphere of racial bias and race-based animus in assignments, wherein he tolerated and

chose not to discipline subordinate officers like [Lieutenant] James who engaged in

remarks such as not permitting African American police officers to use certain equipment

or on certain shifts because he thought they were 'lazy.'"  Doc. 29 ¶ 8.  Plaintiff relies on

a certification by Detective James Rago in support of his allegations about Lieutenant James. CoF ¶¶ 6-7. According to Detective Rago, who worked in the police division since November 2009, he "observed that [Lieutenant] James expressed contempt for members of the investigation unit, specifically non-white members." Rago Certification ¶¶ 1, 3 (JA2206). However, Detective Rago provided only one example of such behavior. "On one particular occasion, I was in the office and heard Lieutenant James refer to investigators in the unit as 'lazy and stupid' and as stupid, incompetent, dumb and lazy. I also heard him say 'they do not know what the fuck they're doing.'" Rago Certification ¶ 4 (JA2206). When Detective Rago objected, James "apologized and responded by saying 'I was not talking about you.'" Id. ¶ 5. With respect to Lieutenant James' request for Detective Aitken at the scene of the shooting, Detective Rago stated that was "consistent with James's preference for white coworkers." Id. ¶ 6. Detective Rago also noted that he was "aware of other employees [that] have reported similar conduct by Lieutenant James to [Captain] Woltema[t]e [and] no action was ever taken by [Captain] Woltemate." Id. ¶ 7.

Detective Rago's certification primarily speaks in generalities, noting that Lieutenant James has "expressed contempt for the members of investigations unit, specifically non-white members," Rago Certification ¶ 3 (JA2206), and that Lieutenant James' request for Detective Aitken at the shooting scene was "consistent with James'[] preference for white coworkers." Id. ¶ 6. As previously noted, the only specific incident to which Detective Rago referred to which he had first-hand knowledge was an incident when Detective Rago heard Lieutenant James refer to investigators in the unit as "lazy

and stupid." Id. ¶ 4.  However, there is no context in which to determine whether the statement was racially motivated because there is no evidence regarding to which specific investigators he was referring or the racial makeup of the investigations unit.

The Third Circuit has made clear that to withstand a motion for summary judgment, "a plaintiff must point to concrete evidence in the record that supports each and every essential element of his case."  Nitkin v. Main Line Health, 67 F.4th 565, 571 (3d Cir. 2023) (quoting Orsatti v. N.J. State Police, 71 F.3d 480, 484 (3d Cir. 1995) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)).

> Although we view all facts in the light most favorable to a plaintiff opposing summary judgment and draw all reasonable inference[s] in that party's favor, a plaintiff who reaches the summary judgment stage may no longer 'rest upon the mere allegations or denials in his pleadings."  D.E. v. Cent. Dauphin Sch. Dist., 765 F.3d 260, 268 (3d Cir. 2014) (quoting Gans v. Mundy, 762 F.2d 338, 341 (3d Cir. 1985)). Nor will "[b]are assertions, conclusory allegations, or suspicions" suffice.  Jutrowski v. Twp. of Riverdale, 904 F.3d 280, 288-89 (3d Cir. 2018) (quoting D.E., 765 F.3d at 269). Instead, the plaintiff "must set forth specific facts establishing a triable issue.  Id. at 288 (quotation omitted).

Nitkin, 67 F.4th at 571.

In Nitkin, the Plaintiff detailed several instances wherein a supervisor would make sexually inappropriate comments directed to her.  67 F.4th at 568.  However, the Third Circuit found that the plaintiff "points to no concrete evidence to support her statement that the [supervisor] made harassing comments on twenty-one occasions."  Id. at 571.  The court concluded that the plaintiff "may not rely merely on 'vague statements' to defeat

summary judgment." Id. (quoting Port Auth. of N.Y & N.J. v. Affiliated FM Ins. Co., 311 F.3d 226, 233 (3d Cir. 2002) (internal quotation omitted).

In Mulholland, a teacher brought a section 1983 action against the Philadelphia School District after he was allegedly assaulted by a group of students at the school. 2025 WL 241464, at *1. The plaintiff argued that his "injuries resulted from the [School] District['s] deliberate policies, customs, and failures to act." Id. The Honorable Joel Slomsky found that Plaintiff's allegations that the defendants "were on notice of the violent tendencies of the students who assaulted plaintiff and on notice of the safety risks and concerns that the area in question posed, yet failed to take any reasonable actions to address the risks and provide a safe work environment," were insufficient "for the Court to infer that [the d]efendants had a custom of permitting assaults to occur . . . through a long-standing pattern of ignoring violent tendencies of students." Id. (internal citations omitted).

Here, Plaintiff has offered no evidence beyond vague allegations that Lieutenant James preferred Caucasian coworkers to support the allegations that the Temple Police Department "tolerated and encouraged an atmosphere of racial bias and race-based animus in assignments," and no evidence whatsoever to support the assertion that the use of equipment was based on race. Doc. 29 ¶ 8. Plaintiff has failed to cite any specific complaints of racial discrimination against Lieutenant James or cite to any such incidents in his personnel file. Detective Rago's Certification is insufficient to establish a pattern of racial animus as it contains vague allegations without personal knowledge.

2.      Temple University employed a custom and/or a practice of utilizing and relying on pre-ordained opinions such as those expressed by Dr. DeSilverio, that rely on and employ flawed, unreliable, and racially motivated diagnoses to reach pre-ordained conclusions

Plaintiff argues that Temple "employed a custom and/or a practice and/or a policy of utilizing and relying on pre-ordained opinions such as those expressed by Dr. DeSilverio, that rely on and employ flawed, unreliable, and racially motivated diagnoses to reach pre-ordained conclusions."  Doc. 51 at 28.  A bit of background is necessary for context.

When Plaintiff requested FMLA leave, his treatment provider, Ms. Domingue, indicated that she was treating Plaintiff for PTSD, anxiety, and depression, and opined that he could not return to work for 90 days as of July 2022.  Domingue Report (JA1681-84).  Temple "challenge[d]" Plaintiff's FMLA request by obtaining a second opinion from Dr. DeSilverio.  Johnston Dep. at 79, 89 (JA1180, 1190).  Rather than disagreeing with the request for FMLA leave, Dr. DeSilverio found that Plaintiff suffered from "a paranoid disorder, unrelated to the incident," characterized by "delusional thinking, as in Delusional Disorder, Persecutory Type," DeSilverio Report (JA1726), resulting in Temple finding that Plaintiff was "disabled from working as a law enforcement officer until further evaluation."  Johnston Dep. at 86 (JA1187).

Plaintiff maintains that Dr. DeSilverio's opinion was "pre-ordained" and relied on "flawed, unreliable, and racially motivated diagnoses to reach pre-ordained conclusions." Doc. 1 at 28.  Plaintiff's argument fails for two main reasons.  First, assuming for purposes of argument that Dr. DeSilverio harbored such racial animus, there is no

evidence in the record that Temple was aware of such bias.  Mr. Johnston testified that

Temple "went through CDC and picked Dr. DeSilverio to do a second opinion for Family

Medical Leave purposes."  Johnston Dep. at 78-79 (JA1179-80).  Plaintiff has offered no

evidence that Temple knew of any such racial proclivities on the part of the doctor.

Second, Plaintiff has failed to provide any evidence from which the jury could

conclude that Dr. DiSilverio was racially biased.  The only information in the record to

support a claim of racial animus on the part of Dr. DiSilverio comes from Dr. Joy, who

disagreed with Dr. DeSilverio's diagnosis.

> Unfortunately, psychiatry has an unfortunate, well-established
> history of overdiagnosing psychotic disorders in Black men;
> this trend has been recognized for over thirty years.

Joy Report at 7 (JA2214).  Plaintiff seizes upon this statement to conclude that Temple

selected Dr. DeSilverio, knowing he "relied on racially biased practices and beliefs."

Doc. 51 at 28.

Allowing Dr. Joy's generalization that psychiatry has a "history of overdiagnosing

psychotic disorder in Black men" to provide the basis for a pattern of discrimination

would require such a finding each and every time an employer sought a second mental-

health opinion in a FMLA claim.  There is no evidence in the record that Dr. DeSilverio

conformed to this stereotype.  In fact, Dr. Joy admitted that she was not aware of "Dr.

D[e]Silverio's diagnostic patterns."  Joy Report at 7 (JA2214).

Because Plaintiff has failed to produce evidence from which a jury could find a

discriminatory policy or custom that caused him harm, Temple University, a state actor,

is not a proper party in this action and I will grant summary judgment for Temple.

B.    **Lieutenant James**

Defendants argue that Lieutenant James is not a proper defendant in this action

because he is not Plaintiff's supervisor.  Plaintiff responds that Lieutenant James had a

higher rank and Plaintiff "could have been subject to discipline based on interactions with

L[ieutenant] James."  Doc. 51 at 30.  Each side relies on Shaw v. Temple University, 357

F.Supp.3d 461 (E.D. Pa. 2019), another case involving the Temple Police Department, in

support of his/its position.

> To state a claim under 42 U.S.C. § 1983, a plaintiff
> must establish that the defendants "exercised power possessed
> by virtue of state law and made possible only because the
> wrongdoer is clothed with the authority of state law."
> Livingston v. Borough of Edgewood, 430 F. App'x 172, 178
> (3d Cir. 2011) (quoting Bonenberger v. Plymouth Twp., 132
> F.3d 20, 23 (3d Cir. 1997)).  "If a state entity places an
> official in the position of supervising a lesser-ranking
> employee and empowers him or her to give orders which the
> subordinate may not disobey without fear of formal reprisal,
> that official wields sufficient authority to satisfy the color of
> law requirement of 42 U.S.C. § 1983. . . .   We therefore look
> to substance rather than form in determining whether an
> individual defendant possesses supervisory authority."
> Bonenberger, 132 F.3d at 24-25 (reversing the district court's
> grant of summary judgment where the police sergeant had
> direct power to give orders to plaintiff during her work shift,
> altered her workload, and could initiate a disciplinary process
> against plaintiff upon disobedience).  "The two primary
> factors the Court examine[s] to determine whether there
> [is] de facto supervisory control [are] 1) whether the
> defendant could alter the plaintiff's workload, and 2) whether
> the plaintiff would face charges of insubordination for failure
> to obey the defendant's order."  Zelinski v. Pa. State Police,
> 108 F. App'x 700, 703 (3d Cir. 2004); Yarnall v. Phila. Sch.
> Dist., 57 F. Supp.3d 410, 428 (E.D. Pa. 2014) (finding that
> there was no de facto supervision where the defendant was a
> co-worker, member of the same union, had no authority over

> the plaintiff or other teachers, and could not "discipline,
> observe, evaluate, or terminate Plaintiffs").

Shaw, 357 F. Supp.3d at 473.

Here, although Lieutenant James outranked Plaintiff, it is clear that they were in two different units -- Plaintiff in investigations and Lieutenant James in patrol. SUF ¶¶ 82-83. Plaintiff maintains that based on their respective ranks, Lieutenant James qualifies as Plaintiff's supervisor. Doc. 51 at 30.[6] I reject this argument.

Plaintiff relies on Captain Enoch McCoy's deposition during which he stated that Plaintiff's actions "could be defined as a violation of our General Order by being determined that it was insubordination." McCoy Dep. at 64 (JA540).[7] However, Captain McCoy testified that Captain Woltemate "would have been responsible for issuing . . . discipline [on Plaintiff]." Id. at 64-65 (JA 540-41). In fact, both Plaintiff and Lieutenant James testified that James did not have supervisory authority over Plaintiff. James Dep. at 34 (JA819); Paramore Dep. at 33 (JA365). Plaintiff specifically stated that "I only report -- me personally I have one person that I report to, and that's Captain Woltemate. I have one person that I receive evaluations from, and that's Captain Woltemate."

---

[6]In Defendants' Statement of Undisputed Facts, they state that "[a]lthough Lieutenant James [] had a higher rank than Plaintiff, who was Sergeant in Investigations, Lieutenant James did not have direct supervisory authority over Plaintiff because Lieutenant James was in Patrol." SUF ¶ 85. Plaintiff denied this statement and stated that "[Lieutenant] James had disciplinary authority over Plaintiff," citing JA1621-22. The citation to the Joint Appendix is to two letters from Mr. Johnston to Plaintiff regarding Fitness for Duty Examinations. JA1621-22. Lieutenant James is not mentioned in either letter.

[7]Captain McCoy worked in the patrol unit. McCoy Dep. at 12 (JA488).

Paramore Dep. at 33 (JA365).  There is no evidence that Lieutenant James had any supervisory authority over Plaintiff.  Therefore, I will grant summary judgment for Lieutenant James.

### C. <u>Retaliation</u>

Plaintiff maintains that Defendants "retaliated against [him] for standing up for his federally protected rights."  Doc. 51 at 30; <u>see</u> <u>also</u> Doc. 29 ¶¶ 29 & 30.  Plaintiff argues that he "objected to [Lieutenant] James engaging in gross stereotypes about people of color being 'lazy' and 'stupid.'"  Doc. 51 at 30-31.  He contends that he "was retaliated against when [Mr.] Johnston sent him to [Dr.] DeSilverio knowing that the latter would conclude as he did."  <u>Id.</u> at 31.  Defendants argue that Plaintiff "does not plead any of the elements necessary for a retaliation claim."  Doc. 49 at 28.

To sustain a retaliation claim, plaintiffs must show "(1) that they engaged in a protected activity, (2) that defendants' retaliatory action was sufficient to deter a person of ordinary firmness from exercising his or her rights, and (3) that there was a causal connection between the protected activity and the retaliatory action."  <u>Shaw</u>, 357 F. Supp.3d at 476 (quoting <u>Lauren W. ex rel Jean W. v. DeFlaminis</u>, 480 F.3d 259, 267 (3d Cir. 2007)).  "To establish the requisite causal connection, a plaintiff usually must prove either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  <u>Id.</u> (quoting <u>Lauren</u>, 480 F.3d at 267.  "A plaintiff must first show that the defendant had knowledge of the protected activity to show that such

19

activity was 'a substantial or motivating factor' in his disciplinary action." Id. (quoting

Ambrose v. Twp. of Robinson, 303 F.3d 488, 493-94 (3d Cir. 2002)).

Defendants contend that "[i]t is incomprehensible from the Amended Complaint

what the supposed protected activity Plaintiff is claiming he engaged in that purportedly

caused retaliation or what action(s) Defendants did, and particularly what Captain

Woltemate supposedly did, that could constitute the requisite adverse employment action

for retaliation." Doc. 49 at 28-29. In response, Plaintiff contends that he "objected to Lt.

James['] engaging in gross stereotypes about people of color being 'lazy' and 'stupid[,]'

[and he] was retaliated against when Johnston sent him to DeSilverio knowing that the

latter would conclude as he did." Doc. 51 at 30-31.[8]

Assuming for purposes of this argument that Plaintiff approached Lieutenant

James about racial discrimination and/or his use of racial stereotypes during the initial

discussion in the Patrol Supervisors' Office, see Paramore Dep. at 33-34 (JA289-90),[9]

---

[8]There is some discussion in the deposition testimony regarding Plaintiff's prior complaint that he was required to shave or shorten his beard. This incident was not mentioned in the Amended Complaint and in responding to Defendant's Statement of Undisputed Facts, with respect to the facts relating to the beard incident, Plaintiff denied that they were material to the current litigation. SUF ¶¶ 48-66, 71-81; Doc. 51 ¶¶ 48-66, 71-81. In addition, in responding to the Summary Judgment Motion, Plaintiff specifically states that he was retaliated against for objecting to Lieutenant James' "engaging in gross stereotypes about people of color being 'lazy' and 'stupid.'" Doc. 51 at 30-31.

[9]According to Lieutenant James, "Paramore was yelling and screaming and cursing" and he "had no clue whatsoever" what Paramore was yelling about. James' Dep. at 83 (JA868). Captain McCoy, whose office was the setting for the continuation of the argument, testified that Plaintiff's issue "was that Lieutenant James was not following the General Orders." McCoy Dep. at 54 (JA530). When Captain McCoy spoke to

Plaintiff has failed to provide evidence of a retaliatory action.  Plaintiff contends, without

any evidence, that Mr. Johnston manufactured and dictated Dr. DeSilverio's conclusions.

"Although it is possible Johnston and DeSilverio discussed something unrelated to

Paramore, it is entirely reasonable for a rational fact finder to conclude they discussed

DeSilverio's conclusions in connection with the latter's then-upcoming examination of

Paramore."  Doc. 51 at 31.  The basis for this argument is Mr. Johnston's deposition

testimony that he "may have" had a verbal conversation with Dr. DeSilverio "sometime

after the exam."  Johnston Dep. at 58-59 (JA1159-60) (emphasis added).  Plaintiff's

speculation regarding the contents of a conversation that "may have" happened after the

doctor examined Plaintiff does not create a genuine issue of material fact.  Robert W.

Mauthe, M.D., P.C. v. MCMC LLC, 387 F. Supp.3d 551, 559 (E.D. Pa. 2019) ("Bare

assertions, conclusory allegations, or suspicions are insufficient to defeat summary

judgment.") (citing Fireman's Ins. Co. v. DuFresne, 676 F.2d 965, 969 (3d Cir. 1982)).

The non-moving party "cannot rely on unsupported allegations, but must go beyond

pleadings and provide some evidence that would show that there exists a genuine issue

for trial."  Jones v. United Parcel Serv., 214 F.3d 402, 407 (3d Cir. 2000).

      Plaintiff also argues that Mr. Johnston sent him to Dr. DeSilverio "knowing that

Dr. DeSilverio's opinion and diagnostic practices were flawed, unreliable, and racially

biased."  Doc. 51 at 31.  As previously discussed, this allegation is based on a statement

in Dr. Joy's opinion that "psychiatry has an unfortunate, well-established history of

---

Plaintiff alone shortly after the incident, there was no mention of any race-based
complaint that Plaintiff had made to Lieutenant James.  Id. at 67-70 (JA543-46).

overdiagnosing psychotic disorders in Black men." Joy Report at 7 (JA2214). However, as previously noted, there is no evidence in the record that Dr. DeSilverio conformed to this stereotype, and Dr. Joy admitted that she was not aware of "Dr. D[e]Silverio's diagnostic patterns." Joy Report at 7 (JA2214). Moreover, as previously discussed, there is no evidence that Mr. Johnston knew what the doctor's diagnosis would be. In fact, according to Mr. Johnston, Temple sent Plaintiff to Dr. DeSilverio to "challenge" Plaintiff's FMLA request. Johnston Dep. at 79, 89 (JA1180, 1190). Absent any evidence of a retaliatory action, the defense is entitled to summary judgment on the retaliation claim.

### D.    Discrimination – Adverse Employment Action

Defendants also move for summary judgment on Plaintiff's race discrimination claims, arguing that Plaintiff was not subjected to an adverse employment action. Doc. 49 at 30-37. Plaintiff responds that his "hostile work environment claim survives summary judgment because [he] was subjected to an [a]dverse [e]mployment [a]ction, specifically that he was terminated based on Dr. DeSilverio's opinion." Doc. 51 at 31-32.[10]

---

[10]Although Plaintiff used the term "hostile work environment" in responding to the summary judgment motion, Plaintiff did not use that term in the Amended Complaint and did not allege that he was constructively discharged based on harassment. "To establish a hostile work environment, [Plaintiff] must plead facts that show [his] 'workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of [his] employment and create an abusive working environment.'" Belton v. Allegheny Gen. Hosp., 703 F. Supp.3d 685, 691-92 (W.D. Pa. 2023) (quoting Betz v. Temple Health Sys., 659 Fed. App'x 137, 142 (3d Cir. 2016)). Plaintiff's bare allegations combined with the Rago Certification, referring to one specific instance where it is not clear that race was the motivating factor,

"[T]he substantive elements of a claim under section 1981 are generally identical to the elements of an employment discrimination claim under Title VII," Brown v. J. Kaz, Inc., 581 F.3d 175, 181-82 (3d Cir. 2009), and the McDonnell Douglas Corporation v. Green burden-shifting analysis is utilized. 411 U.S. 792, 802 (1973). Therefore, in order to establish a prima facie claim for discrimination, a plaintiff must show that "(1) [he] is a member of a protected class; (2) [he] was qualified for the position in question; (3) [he] suffered an adverse employment action; and (4) that adverse employment action gives rise to an inference of unlawful discrimination." Seeney v. Elwyn, Inc., 409 Fed. App'x 570, 573-74 (3d Cir. 2011) (citing Texas Dep't of Comm. Affairs v. Burdine, 450 U.S. 248, 253 (1981)). If the plaintiff establishes a prima facie case of discrimination, the burden shifts to the defendant to "articulate some legitimate, nondiscriminatory reason for the [employer's unfavorable employment decision]." Sarullo v. U.S. Postal Serv., 352 F.3d 789, 797 (citing McDonnell Douglas, 411 U.S. at 802); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 507 (1993). Once the defendant has proffered evidence of a nondiscriminatory reason for the employment decision, the burden shifts back to the plaintiff "to provide evidence from which a factfinder could reasonably infer that the employer's proffered justification is merely a pretext for discrimination." Burton v. Teleflex, Inc., 707 F.3d 417, 426-27 (3d Cir. 2013).

Here, Defendants maintain that "there is no evidence on the record from which a factfinder could conclude that there was an adverse employment action on the basis of

---

are insufficient to raise a genuine issue of fact regarding the severity or pervasiveness of the alleged racial discrimination.

race." Doc. 49 at 24. Plaintiff argues that "[h]is ability to continue working as a police officer was terminated" by a racially biased opinion given by Dr. DeSilverio. Doc. 51 at 32.

To the extent Plaintiff argues that sending him for a second opinion when he requested FMLA leave constitutes an adverse employment action, I reject the argument. In granting a motion for summary judgment on similar facts, the Honorable John Gallagher addressed a similar argument where the plaintiff challenged her employer's requirement that she be evaluated by an independent neurologist before approving paid medical leave and later assessing her ability to return to work following paid leave.

> [B]ecause there is no evidence Defendant treated Plaintiff differently than any other employee who had applied for paid medical leave, Defendant's insistence on follow-up and second opinion medical evaluations was not an adverse employment action. Place v. Abbott Lab'ys, 215 F.3d 803, 809 (7th Cir. 2000) (finding second opinion medical evaluation did not constitute adverse employment action when the employer's request for the evaluation was consistent with company policy and practice); Klatt v. Twp. of Moorestown, [Civ. No. 06-4320], 2009 WL 77550, at *3 (D.N.J. Jan. 8, 2009) ("To be sure, the mere requirement of a medical examination to determine Plaintiff's fitness for duty was not an adverse employment action in itself."); Harley v. McCoach, 928 F. Supp. 533, 542 (E.D. Pa. 1996) (finding requirement to undergo medical evaluation not to constitute adverse employment action) . . . .

Behm v. Mack Trucks, Inc., Civ. No. 21-2500, 2022 WL 2068425, at *5 (E.D. Pa. June 8, 2022).

Here, like Behm, "there is no evidence Defendant treated Plaintiff differently than any other employee who had applied for paid medical leave" by requiring an independent

evaluation.  2022 WL 2068425, at *5.  Mr. Johnston explained that "we can only

challenge a request for Family Medical Leave through a second opinion."  Johnston Dep.

at 89 (JA1190).  When Plaintiff applied for FMLA leave, Temple requested a second

opinion.  See Johnston Aug. 22, 2022 Letter (JA1685).  The mere referral to a doctor for

a second opinion does not amount to an adverse employment action.  Additionally, as

previously discussed, Plaintiff's argument that Dr. DeSilverio's assessment is racially

biased is based on Dr. Joy's characterization that "psychiatry has an unfortunate, well-

established history of overdiagnosing psychotic disorders in Black men," without the

doctor knowing or reviewing any information regarding Dr. DeSilverio's diagnostic

patterns.  Joy Report at 7 (JA2214).  Such speculation is insufficient to defeat summary

judgment.

Moreover, Plaintiff's reliance on Dr. DeSilverio's opinion to support an adverse

employment action is misplaced.  Plaintiff argues that "[h]is ability to continue working

as a police officer was terminated by the opinion given by Dr. DeSilverio."  Doc. 51 at

32.  This statement is not completely accurate.  Although Dr. DeSilverio found that

Plaintiff suffered from "a paranoid disorder," which, "as long as active, would be

considered disqualifying for law enforcement positions," the doctor noted that he "would

defer to a second opinion in regard to permanency."  DeSilverio Report (JA1726).  At

that point, the evidence shows that Mr. Johnston and Plaintiff tried to work together to

obtain a third opinion.  Johnston Dep. at 94-97 (JA1195-98); Paramore Dep. at 77-81

(JA409-13); see also email communications Oct. 11, 2022 - Jan. 31, 2023 (JA1757-

1938).  Ultimately, no third opinion was obtained.  Finally, in November 2024, after

25

Prudential terminated Plaintiff's long-term disability benefits, Temple terminated Plaintiff's employment, but stated that "[i]f you are released to return to work by your physician and would like to return to employment at Temple University, please consult the Temple University employment website . . . for available positions." Johnston Letter, Nov. 13, 2024 (JA2137). As Defendants point out, "[t]he decision to terminate Plaintiff's employment was made administratively almost two years after Dr. DeSilverio's report and was strictly in accordance with Temple's human resources policies for someone who is out of the workplace and is done collecting long term disability benefits. There is no evidence that this had anything to do with Dr. DeSilverio's report forms." Doc. 55 at 14 (citing SUF ¶¶ 129-35, JA1728-1733, JA1940-41, JA1947, JA2035, JA2063, JA2138-40, JA1974, JA2137).

In short, Plaintiff sought FMLA leave as a result of the alleged trauma he suffered on July 22, 2022. His mental health provider opined in the paperwork that Plaintiff was suffering from PTSD, anxiety, and depression, and would be out of work for 90 days. Temple sought a second opinion to defeat Plaintiff's request for leave. Instead, the second opinion confirmed that Plaintiff was entitled to FMLA leave and raised questions about a paranoid disorder, but the doctor did not opine about the duration of Plaintiff's absence. Although Plaintiff requested a third opinion, he was never examined by a third mental health professional and he applied for long-term disability. When Prudential terminated his long-term disability, Temple terminated his employment pursuant to University policy absent any consideration of race. Thus, Plaintiff has not produced

evidence to support that he suffered an adverse employment action which gives rise to an inference of discrimination.

## IV.    <u>CONCLUSION</u>

For the reasons explained above, the Court will grant summary judgment in favor of the Defendants on all claims.  Having determined that Defendants are entitled to judgment on all Plaintiff's claims, I need not address punitive damages.

An appropriate Order follows.